UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| HEIDI ROSICH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No.: 2:09CV155-PPS |
| | ) |
| SUR-TOWNSEND PONTIAC, INC. and | ) |
| MICHAEL SUR, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Heidi Rosich worked in the Service Department of a Pontiac dealership in Valparaiso, Indiana for a year-and-a-half until she was fired on July 2, 2008. She filed this lawsuit against defendants Sur-Townsend Pontiac, Inc. and Michael Sur, its President, alleging that her termination was unlawful on various grounds. The dealership and Sur have now filed a motion for summary judgment on the two remaining claims – Count I alleging sex discrimination in violation of Title VII, and Count II alleging interference with and retaliation for the invocation of rights under an employee health benefit plan in violation of ERISA.[1]

Rosich appears to have abandoned her ERISA claim, as she offers no response to the dealership's summary judgment challenge to Count II. Summary judgment will be granted as to the ERISA claim without further discussion. *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (claims not addressed in a summary judgment opposition brief are abandoned).

---

[1] Count III, a claim that defendants violated the Family Medical Leave Act, was voluntarily dismissed on November 2, 2010.

As pled, the remaining Title VII claim in Count I seeks no relief against individual defendant Michael Sur, in apparent recognition that claims under Title VII lie only against the employing entity and not individual managers or supervisors. *Schandelmeier-Bartels v. Chicago Park Dist*. 634 F.3d 372, 381 (7th Cir. 2011). So the disposition of the ERISA claim in Count II also ends the claims against Michael Sur personally. What remains is Rosich's claim that the dealership terminated her employment on the basis of her gender.

**FACTS**

Rosich was hired around December 26, 2006 as one of two Service Advisors, a position in which she would serve as a liaison between customers bringing in cars for service and the mechanics and technicians who perform the service, as well as handle the associated repair orders. At the time of her hiring, the Service Manager was Dan Belonger. Rosich replaced an out-going female Service Advisor, and thereafter worked with male Service Advisor Hector Pagan.

Describing Rosich's job performance under Belonger, the dealership asserts that Rosich received "verbal counseling for various issues related to her job responsibilities." [DE 36, p.3.] But the only evidence cited for this proposition is a range of pages from Rosich's deposition. And the deposition testimony cited does not support a particularly damning characterization of management response to Rosich's performance. Instead, in it Rosich merely testifies that:

- a couple times, Belonger talked to her about "issues on what needed to be done...a normal, general, 'This is what needs to be done' thing," in response to which she "would make sure that that's the way that it would carry out." [ DE 37-1, p.9 (47:19-48:5).][2]

---

[2] Cites to the record are to the page number of the document as filed with the Court, rather than to the potentially different internal page number of the document. In the case of deposition excerpts, the parenthetical information will indicate the internal page and line numbers within the deposition.

- customer surveys were offered in which Rosich as Service Advisor could be reviewed, and in "a couple" Rosich received negative feedback [*Id.* at 10 (50:4).]

- as for any "counseling" from Belonger, Rosich recalled only that "he would give me some pointers and tell me what I needed to do. That was it." [*Id.* (52:5-7).]

Defendants also assert as an undisputed material fact that Michael Sur "received customer complaints concerning Rosich being rude, uncommunicative, and disinterested in helping." [DE 36, p.4.] The deposition testimony cited is to that effect, but also indicates that Sur was unable to remember the number of such complaints, was unable to identify any complaining customers, couldn't remember whether he had ever spoken to Rosich about the complaints, and was unaware whether any written warnings had ever been given to Rosich. [DE 37-2, pp.11-12 (43:11-44:7).]

Notably, the dealership is unable to cite any written reprimands, warnings or notations in Rosich's personnel file indicating that her job performance was criticized or was lacking in any way. Rosich testified in her deposition that during her employment at Sur Pontiac she had never been given any type of written counseling or written complaints or admonishments about her job performance, and was never given reason to believe her job was in jeopardy. [DE 39-1, p. 31 (129:8-16 and 132:17-20).] What's more, employers don't tend to reward slackers. So the best evidence that Rosich was performing up to snuff is the fact that during her employment with Sur Pontiac, Rosich received the maximum monthly bonus of $500 "most every month." [*Id.* at 32 (134:3-8).]

On June 9, 2008, Michael Sur replaced Belonger with a new Service Manager, Jim Gruber, who had been hired from another car dealership. In the first three weeks of his employment, Gruber complained to Sur about Rosich's performance three times. Gruber

3

testified in his deposition that over those three weeks, he saw Rosich ignore a page or phone call, or ignore a customer who entered the Service Department, without any apparent justification, at least a dozen times. [DE 37-3, p.8 (41:12-23).] Rosich acknowledges that Gruber spoke to her about this, but doesn't believe there was "any reason for it." [DE 37-1, p.12 (57:20-58:1).] Rosich testifies that she did answer the phones and pay attention to customers that came in. [*Id.* (57:24-58:2).] Hector Pagan testified in his deposition that walk-in customers and incoming service calls are sometimes ignored briefly for several minutes, depending on how busy the Service Department is. [DE 37-4, pp. 6-7 (30:17-31:17).]

Ultimately, the "straw that broke the camel's back," and resulted in Gruber's recommending that Rosich be fired, was an incident on June 30, 2008 over Rosich's handling of a "goodwill" repair. [DE 37-3, p.7 (35;1-17).] As the name suggests, a goodwill repair is a repair made at no charge to the customer as though "extending the customer warranty when the vehicle is actually out of warranty." [DE 37-3, p. 7 (35:3-6).] Gruber testified that Rosich asked him about approving a goodwill repair on a steering shaft, and that he told her she could do it "as long as the customer doesn't have an extended warranty. Make sure you check that." [*Id.* (35:7-9).] Gruber later discovered that the customer did have an extended warranty, and intercepted the repair order in time to correct it so that the claim could be processed through the extended warranty and the dealership would receive compensation accordingly. Because the existence of the extended warranty was readily discoverable via computer and the customer's records, Gruber concluded that Rosich had not checked that information as he had directed. Because of Gruber's intervention, the dealership avoided any adverse financial consequences from the manner in which Rosich initially processed the repair order.

4

Rosich testified in her deposition that she has no recollection of this extended warranty repair issue. [DE 37-1, pp. 14-16 (66:6-21; 72:25-73:4; 74:3-8).] At his deposition, Hector Pagan testified that under Gruber's predecessor, the Service Advisors had leeway to authorize goodwill repairs for good customers when their cars were less than 1,000 miles over their initial warranty. [DE 37-4, p.5 (24:15-20).] The car involved in the June 30 incident was 603 miles over its warranty. [DE 39-9, p.1.] Pagan testified that Jim Gruber reined in the Service Advisors' discretion to authorize goodwill repairs several months *after* Rosich left, or perhaps not until the next year. [DE 37-4, p.5 (25:11-26:20).]

On July 2, 2008, just three weeks after Gruber's entry on the scene and on Gruber's recommendation, the dealership terminated Rosich. Michael Sur and Gruber met with Rosich in Gruber's office. Of the very brief meeting, Gruber recalls that Sur did the talking, and that Sur told Rosich that she was not a "good fit for the position we need and the direction we are going in the service department." [DE 37-3, p.10 (49:17-19).] Sur's testimony is that he "told her that the service department was moving in a different direction, and that's why I brought Jim in to change the culture of the service department, and that Jim and I didn't feel that she fit into that culture. So we needed to part ways." [DE 37-2, p.14 (61:6-10).]

Rosich's recollection of the meeting is substantially different. She believes that Gruber was the speaker rather than Sur, and that he "told me that because the economy was bad, that they no longer felt that they had a position for me." [DE 37-1, p.13 (64:4-8).] Rosich does not remember a statement being made about the department moving in a different direction. [DE 37-1, pp.13-14 (64:23-65:4).] Co-worker Hector Pagan corroborates Rosich to a certain extent. He

testified that, after leaving the meeting, Rosich told him that she was being let go or laid off "because things were slow." [DE 39-4, p.12 (14:7-9).]

This contemporaneous statement from Rosich to Pagan is the same thing that Rosich now says that Gruber told her at the termination meeting. It seems unlikely that Rosich would have made that up on the spur of the moment. This is important because, as we will see, Rosich wasn't laid off because "things were slow." Rather, a man named John Hesterman was immediately hired to replace her. Gruber and Hesterman were buddies, having worked together previously at the Chevrolet dealership Gruber had come from, and Gruber contacted Hesterman about his potential interest in a position at Sur Pontiac in late June 2008, *prior* to Rosich's termination on July 2. So taking events in the light most favorable to Rosich, the explanation that she was fired for economic reasons makes the immediate hiring of Hesterman a little suspicious. In any event, the day of Rosich's firing, Gruber again contacted Hesterman to let him know the position was now available, and Hesterman met with Gruber and Sur later that same day. He was offered the position two days later. Jim Gruber has not been the direct supervisor of any other female employee either before or after Heidi Rosich was fired and replaced with a male employee. [DE 37-3, p.16 (79:2-7).]

Rosich contrasts her termination without warning to the dealership's treatment of a number of male service advisors. Tom Gearhart, for example, was given two written warnings in the months preceding his termination in 2004. [DE 39-10.] Service advisor Hector Pagan has been called into the service manager's office to be talked to about various performance matters, but remains employed at the dealership. [DE 37-4, pp. 6 (28:1-13); DE 39-4, pp. 61-62 (63:19-64:3).] Rosich's successor John Hesterman received a written warning in December 2008

6

concerning a low repair order performance number. [DE 39-2, pp.81-82, 86.] Michael Sur prepared a letter in May 2009 counseling Gruber, Hesterman and Pagan about low Customer Satisfaction Index scores. [DE 39-13, p.7.] Hesterman received and signed a notice on June 30, 2009 about a second occurrence in which a recall repair was performed on a non-qualifying vehicle. [DE 39-13, p.8.] Shortly before Gruber's deposition was taken in this case, he gave Hesterman a written warning about his argumentative attitude with Gruber. [DE 39-2, p. 71 (73:6-22).] But unlike Rosich, Hesterman and Pagan remain on the payroll.

In contrast, as earlier noted, Rosich received no written warnings or other indication that her job was in jeopardy if she failed to respond to direction. Similarly, no written warnings or other employee discipline are reflected in the personnel file of the third and only other service advisor terminated by the dealership, female Kathleen Manchura.

## APPLICABLE STANDARDS

Fed.R.Civ.P. 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." This standard is met if "no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). On summary judgment, facts and inferences are construed in favor of the non-moving party. *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 376 (7th Cir. 2010).

To prevail on a Title VII discrimination claim, a plaintiff must establish that she is the victim of intentional discrimination. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999). The plaintiff may establish discrimination through either the "indirect" or "direct"

method of proof. *Id.* To defeat a motion for summary judgment in a Title VII case under the indirect approach, the plaintiff must first establish a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) that she was treated less favorably than one or more similarly situated employees outside of her protected class. *See Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 547 (7th Cir. 2002); *Stockett v. Muncie Indiana Transit Sys.,* 221 F.3d 997, 1001 (7th Cir. 2000).[3]

If Rosich establishes a *prima facie* case, the burden shifts to the dealership to articulate a legitimate non-discriminatory reason for Rosich's termination. At that point, Rosich's claim would survive summary judgment only if she is able to offer evidence that the proffered reason was a pretext. *Silverman*, 637 F.3d at 736. That showing requires evidence that "the nondiscriminatory reason was dishonest and that the defendants' true reason was based on discriminatory intent." *Radentz v. Marion County*, 640 F.3d 754, 757 (7th Cir. 2011).

Under the direct method, Rosich is not required to present direct evidence, such as the rare explicit statement of discriminatory animus, but can survive summary judgment by presenting evidence supporting a chain of inferences sufficient to establish a discriminatory motive on the part of the dealership. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010). The Seventh Circuit has characterized this as the presentation of "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011)

---

[3] The dealership does not dispute that Rosich was in a protected class or that her termination constituted an adverse employment action. [DE 36, p. 10.]

8

(quotation omitted). But "[w]hether deemed a chain or a mosaic, the assembled evidence must point 'directly to a discriminatory reason for the employer's action' for [plaintiff's] claim to survive summary judgment." *Davis v. Time Warner Cable*, ___ F.3d ___, 2011 WL 26 11303, *6 (7th Cir. July 5, 2011) (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Three types of evidence can support the required inferential chain. The first includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Department Stores Co.*, 30 F.3d 734, 736 (7th Cir. 1994). The second species of evidence is a showing that the employer systematically gave better treatment to other similarly situated employees not in the same protected class as Rosich. *Silverman*, 637 F.3d at 734. The third type of evidence is that the employer's justification for Rosich's termination is pretextual. *Id.*

## ANALYSIS

Although the final decisionmaking authority here might have been Michael Sur, Rosich ascribes the discriminatory motive to Service Manager Gruber. The prejudices of a supervisor who is not ultimately the formal decisionmaker can be imputed to the employer under a "cat's paw" theory: "Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a 'motivating factor in the employer's action[.]'" *Staub v. Proctor Hospital*, ___ U.S. ___, 131 S.Ct. 1186, 1193 (March 1, 2011). On remand in *Staub*, the Seventh Circuit outlined the three elements of the Supreme Court's "cat's paw" rubric: (1) the supervisor

9

performed an act motivated by discriminatory animus, (2) the supervisor performed that act intending to cause an adverse employment action, and (3) the act was a proximate cause of the ultimate employment action taken. *Staub v. Proctor Hospital*, __ F.3d __, 2011 WL 1979719, **1-2 (7th Cir. May 23, 2011).

Construing the facts and inferences in Rosich's favor for purposes of the summary judgment motion, it could be said that Gruber's influence on the termination decision rendered Sur merely a "cat's paw." Sur had no apparent dissatisfaction with Rosich prior to Gruber's tenure. In fact, it seems that he was rather pleased with her performance since he paid her a monthly bonus nearly every month. But when Gruber complained to Sur three times about Rosich during his first three weeks on the job, he was evidently able to persuade Sur that Rosich should be fired, and she was.

As indicated above, the evidence relied upon by the dealership is not as strong as its negative characterization of Rosich's job performance suggests. What the evidence supports is merely that the previous Service Manager Dan Belonger had occasionally told Rosich how certain things needed to be done, and that she had received some negative feedback on customer surveys. Under Jim Gruber, the new Service Manager, there is a dispute of fact as to whether Rosich was guilty of ignoring phone calls and customers without justification. The goodwill repair incident that the dealership cites as pivotal in its decisionmaking is not recalled by Rosich. So it is undisputed for purposes of summary judgment analysis that Rosich authorized the repair when the customer had an extended warranty, contrary to Gruber's direction, but also that the goodwill repair was consistent with the authority Rosich had under Gruber's predecessor, who had left only three weeks earlier. Overall, the evidence indicates that plaintiff was a capable

employee without a remarkable or significant history of problems and who regularly received the maximum monthly performance bonus in her pay.

There is a dispute of fact as to what Rosich was told at her termination, but even the dealership's version does not include any mention of performance issues either generally or specifically, including the controversial goodwill repair.  Neither does Rosich's personnel file contain any record of poor performance or disciplinary issues.  In contrast, Rosich cites the experience of several male Service Department employees who have been given warnings -- including written warnings -- but not terminated, or who were not terminated for months after written warnings were given.  There is uncontradicted evidence that, even prior to Rosich's termination, the new Service Manager had a particular male in mind to succeed Rosich in her position, and took steps to insure his availability and interest in the job.

Under the direct method, do these facts create a convincing mosaic that points directly to a discriminatory motive for Rosich's termination?  I think the mosaic certainly suggests the *possibility* that gender may have played a role in Rosich's firing.  But to say the evidence "points directly" to sex discrimination goes too far.  Equally possible on this evidence is that Gruber just didn't like Rosich, and/or that (rightly or wrongly) he didn't think she performed her job well, and/or that he wanted to put John Hesterman in the position for reasons that have nothing to do with Hesterman's and Rosich's gender. The inconclusiveness of the inferential chain of the evidence makes it insufficient for surviving summary judgment under the direct method.

By contrast, under the indirect method, Rosich's evidence is sufficient to meet the two disputed elements of the *prima facie* case. The tolerance shown to male Service Advisors with performance and attitude issues satisfies the similarly situated employees element.  Rosich's

11

evidence (though disputed) also supports the conclusion that she was performing her job duties satisfactorily. The shifting burden is then met by the dealership's evidence (though disputed) that Rosich was terminated based on dissatisfaction with her attention to customer service and her failure to comply with Gruber's instructions about the June 30 goodwill repair.

The determination then comes down to the sufficiency of Rosich's evidence of pretext. "An employer's justification may be considered pretextual where the plaintiff demonstrates that it had no basis in fact, it did not actually motivate the decision to terminate employment, or it was insufficient to motivate that decision." *Radentz*, 640 F.3d at 757. Rosich's showing on pretext is largely the same as what she offers as the inferential chain of circumstantial evidence supporting the conclusion that she was singled out in a male-dominated workplace for termination because she is female. As I've already indicated, on the record before me a reasonable jury could so conclude, believing that after only three weeks, Gruber targeted plaintiff for termination because she was a woman, offering only makeweight reasons for which men have not faced the same fate. What's more, the dealership's reasons for terminating Rosich appears to have waxed and waned. According to Rosich, whose version I must now take as fact, Gruber told her that she was being let go because business was slow. But this was demonstrably false. The dealership wasn't tightening its belt. We know this because it interviewed Hesterman that very same day. Shifting justifications for an adverse employment action is one way to establish pretext. *Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.").

A jury could also reasonably conclude to the contrary, that Rosich's being female was not the motivation, but rather her (real or perceived) inadequacies in responding to customers, her (real or perceived) non-cooperation and non-compliance with Gruber, or a desire to replace her with Hesterman that has nothing to do with Gruber's sex. This relative balance in persuasion is enough to defeat a plaintiff under the direct method, which requires plaintiff's evidence to "point directly" to a discriminatory motive. But it is enough to save a plaintiff who is able to reach this point in the indirect method analysis, where Rosich has adduced strong enough evidence to "leave a disinterested observer doubting the honesty of the [dealership's] stated reason" for her termination, permitting an inference of a discriminatory motive. *Silverman*, 637 F.3d at 738.[4]

The Seventh Circuit has said: "The practical test for summary judgment is whether if the evidence gathered in the summary judgment proceeding were presented at trial the party moving for summary judgment would be entitled to a directed verdict." *Wallace*, 103 F.3d at 1399. Because a reasonable jury could reject the dealership's proffered nondiscriminatory reasons for firing Rosich, and find in favor of Rosich on her claim that her termination was motivated by her gender, I will deny the summary judgment motion as to Count I.

---

[4] This difference between the requirements of the direct and indirect methods has been noted by the Seventh Circuit:

> We also note that, assuming Van Antwerp marshaled enough circumstantial evidence to show pretext, his claim of discrimination under the direct method would still fail. Evidence under the direct method "must allow a jury to infer *more than pretext*; it must itself show that the decisionmaker acted because of the prohibited animus."

*Van Antwerp*, 627 F.3d at 298 (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)) (emphasis added).

ACCORDINGLY:

Defendants' Motion for Summary Judgment [DE 35] is DENIED as to the Title VII sex discrimination claim in Count I, but GRANTED as to the ERISA claim in Count II.

ENTERED: July 26, 2011.

        /s/ Philip P. Simon
       CHIEF JUDGE
       UNITED STATES DISTRICT COURT